UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

    v.                                              CASE NO. 3:23-cr-14-TJC-LLL

LUCAS SHIRLEY II

## UNITED STATES' SENTENCING MEMORANDUM

The defendant, Lucas Shirley, sold numerous unregistered short-barreled rifles and machineguns equipped with silencers to two men who he believed were leaders of a biker gang. When federal agents search his home, they found tools, equipment, and raw materials for illegally manufacturing more silencers and machineguns. They also found additional firearms, a silencer, ammunition, and a dozen devices that convert semi-automatic firearms into fully automatic machineguns.

Notwithstanding these undisputed facts, the presentence investigation report (Doc. 39) concludes that the defendant was not engaged in firearms trafficking. It also concludes that the defendant did not have reason to believe that his sale of several silencer-equipped, short-barreled machineguns to gang members had the potential to facilitate their commission of other crimes. And even though the defendant's machinegun conversion devices fall within the statutory definition of "firearm," *see* 26 U.S.C. § 5845(a)-(b), the PSR reaches the opposite conclusion when counting how many firearms were involved in the defendant's offense.

These conclusion are incorrect, and therefore, the United States objects to paragraphs 24, 28, 32, 86, and 94 of the PSR, which fails to include three associated specific offense characteristic enhancements.

First, the PSR erroneously fails to include a 6-level enhancement that should apply under USSG § 2K2.1(b)(1)(C) because the defendant's offense involved between 25 and 99 firearms (including machinegun conversion devices). Second, the PSR erroneously fails to include a 4-level enhancement that should apply under USSG § 2K2.1(b)(5) because the defendant engaged in firearms trafficking. Finally, the PSR erroneously fails to include an additional 4-level enhancement that should apply under USSG § 2K2.1(b)(6)(B) because the defendant both possessed firearms in connection with another felony offense and also transferred firearms with reason to believe that they would be used in connection with another felony offense.

If each enhancement were applied, then the defendant's total offense level would be 33 (rather than 23) and his Guidelines sentencing range would be affixed at the 10-year statutory maximum (rather than 46-57 months' imprisonment).

As previewed at the last hearing in this case, the United States will be seeking a significant sentence in this case, albeit one below the correctly calculated 10-year Guidelines range. Nevertheless, it is the parties' and Court's shared obligation to ensure that the Guidelines range is properly determined. For the reasons that follow, the United States respectfully requests that the Court sustain its objections so that the sentencing range can be accurately gaged.

I.  **The Guidelines Sentencing Range Should Reflect that the Defendant's Offense Involved 25 or More Firearms.**

The principal Sentencing Guideline provision in this case, USSG § 2K2.1(a)(3), calls for a base offense level of 22 if, among other things, "the offense involved a firearm described in 26 U.S.C. § 5845(a)." PSR ¶ 23. Section 5845(a), in turn, defines a "firearm" to include, among other things, a silencer, a short-barreled rifle (i.e., "a rifle having a barrel or barrels of less than 16 inches in length"), and a "machinegun." The term "machinegun" is defined to include conversion devices consisting of a part or combination of parts designed and intended for use in converting a weapon into a machinegun, such as the machinegun conversion devices that the defendant admitted possessing in this case. *See* 26 U.S.C. § 5845(b) (defining "machinegun" to include machinegun conversion devices); Doc. 34 at 23 (factual basis of plea agreement documenting the defendant's possession of "12 parts and combinations of parts intended for use in converting firearms into machineguns").

In firearms cases, there is a specific offense characteristics enhancement based on the number of firearms that "the offense involved." USSG § 2K2.1(b). In this context, the term "offense" includes both the offense of conviction and "all relevant conduct" under USSG § 1B1.3. *See* USSG § 1B1.1 cmt. 1(I).

Considering this defendant's offense of conviction and all relevant conduct, his "offense" involved the unlicensed manufacturing, possession, and trafficking of unregistered firearms. These "firearms" included silencers, short-barreled rifles, and

machineguns (including machinegun conversion devices) – all of which are firearms that are "described in 26 U.S.C. § 5845(a)" and that – again – trigger the base offense level of 22 in this case under USSG § 2K2.1(a)(3). But because the defendant's offense involved between 25 and 99 firearms, his base offense level should be increased by 6 levels, pursuant to USSG § 2K2.1(b)(1)(C). *See* PSR ¶¶ 10, 13-14, 16 (documenting the defendant's sale of 7 rifles, 5 silencers, and 3 pistols, and his possession of an additional rifle, silencer, pistol, and 12 machinegun conversion devices).

The probation department notes, however, that the commentary to the Guideline, states that for purposes of this guideline, "'[f]irearm' has the meaning given that term in 18 U.S.C. § 921(a)(3)." USSG § 2K2.1 cmt. 1. Section 921(a)(3), in turn, defines a firearm as "(A) any weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." The definition of "firearm" in section 921(a)(3) does not include machinegun conversion devices.

Nevertheless, these devices still should be considered when counting "firearms" under USSG § 2K2.1(b)(1) for two reasons. First, the language of the Guideline used to calculate the base offense level here clearly defines firearms as including items described in 26 U.S.C. § 5845(a), which this Court also should use to determine which specific offense characteristics apply. Second, the Guideline is

4

unambiguous in this respect and thus resorting to the commentary is unnecessary (*see, e.g., United States v. Dupree*, 57 F.4th 1269, 1279 (11th Cir. 2023) (*en banc*)).[1]

### A. The Guideline Definition of "Firearm" Clearly Includes Machinegun Conversion Devices.

The commentary's general definition of "firearm" does not apply to the offense here, which is based on the Guideline's more-specific application to "firearm[s] described in 26 U.S.C. § 5845(a)." A "specific statutory provision trumps a general one." *Nguyen v. United States*, 556 F.3d 1244, 1253 (11th Cir. 2009). "[W]hen presented with a potential overlap between the broadly sweeping terms of a statute of general application that appear to apply to an entire class, and the narrow but specific terms of a statute that apply to only a subgroup of that class, [courts] avoid conflict between the two by reading the specific" – in this instance, the guideline's reference to 26 U.S.C. § 5845(a) – "as an exception to the general" rule, here, the commentary's reference to section 921(a)(3). *See ConArt, Inc. v. Hellmuth, Obata + Kassabaum, Inc.*, 504 F.3d 1208, 1210 (11th Cir. 2007).

Moreover, the Guideline uses the same terminology in describing the base offense level determination (*e.g.*, when "*the offense involved*" a firearm described in 26 U.S.C. § 5845(a), *see* § 2K2.1(a)(5)) that it uses for the specific offense characteristic (when "*the offense involved*" three or more firearms, *see* § 2K2.1(b)(1)). This

---

[1] The United States notes its continuing disagreement with *Dupree* and cases like it; we rely on *Dupree* here only insofar as it is binding and thus controls the proper calculation of the guidelines range.

5

commonality, too, indicates that the court is not to switch to an entirely new definition of what the "offense involved" at the second part of the offense level calculation involving the specific offense characteristics. Rather, the Guideline's initial reference to a "firearm described in 26 U.S.C. § 5845(a)" is a term of art that guides the offense level determination. It is not affected by the entirely different definition of "firearm" in the commentary, which will govern defendants whose offenses do not involve the specific types of firearms spelled out in the guideline itself.

It thus made sense, for example, for the court in *United States v. Dodson*, 519 F. App'x 344 (6th Cir. 2013) (unpublished), to look to the definition of a firearm in section 5845(b), <u>not</u> in section 921(a)(3), in deciding whether a defendant's "halved grease gun" was a "firearm" subject to enhancement under USSG § 2K2.1(b)(4) (addressing firearms with altered or obliterated serial numbers). The Court upheld the enhancement because the firearm was a "readily restorable" machinegun "under the terms of 26 U.S.C. § 5845(b)." *Dodson*, 519 F. App'x at 352.

Additionally, the history of the 2K2.1 Guideline indicates that the Guideline's more specific definition is intended to control in this context. Until 2004, the commentary did not just refer to the statutes for its definitions of "firearm" and "ammunition," as it does now. Rather, the commentary spelled out the statutory terms, and—important here—it also did that with respect to "firearm described in 26 U.S.C. § 5845(a)." *See, e.g.,* United States Sentencing Guidelines Manual, § 2K2.1, comment. (n.3) (Nov. 2001). That definition in the commentary specified section

6

5845(a)'s five types of firearms (including machineguns) and said, "For a more detailed definition, refer to 26 U.S.C. § 5845." But when the Commission amended the Guideline and commentary to adopt the statutory definition of "destructive devices," it struck the definitions "[f]or consistency," and substituted "similar statutory definitions … for the definitions of 'ammunition' and 'firearm.'" Amendment 669, Reason for Amendment. The new definitions, as mentioned above, simply refer to the statutory definitions, rather than replicating them. *See, e.g.,* USSG § 2K2.2, comment. (n.1) ("'Firearm' has the meaning given that term in 18 U.S.C. § 921(a)(3)."). The commentary's definition for "firearm described in 26 U.S.C. § 5845(a)," though, was not replaced, presumably because the description in the Guideline is itself consistent with the other, new definitions. It would not have made sense for the commentary to say: "'Firearm described in 26 U.S.C. § 5845(a)' has the meaning given that term in 26 U.S.C. § 5845(a)." What does make sense is that the Commission recognized that the Guideline definition is itself clear and sufficient. And nothing in the Commission's amendment suggests that the Commission intended to alter or diminish the meaning of the Guideline's references to section 5845(a), let alone to allow the commentary's "firearm" definition to take precedence over what is obvious from the text of the Guideline.

In sum, the Guideline's language—including the specific offense characteristic provisions—clearly applies to firearms described in section 5845(a), including machinegun conversion devices. Therefore, resorting to the commentary to upend the Guideline's unambiguous meaning would be error.

7

One district court has seemingly ruled otherwise. *See United States v. Hixson*, 624 F. Supp. 3d 930 (N.D. Ill. 2022). That court said that "[t]he Guidelines do *not* include machine guns—including devices that convert semiautomatic weapons into fully automatic weapons—in the definition of 'firearms.' *Compare* 18 U.S.C. § 921(a)(23) (definition of machinegun) *with* § 2K2.1 Application Note 1 (defining firearm to mean the definition in 18 U.S.C. § 921(a)(3))." *Hixson*, 624 F. Supp. 3d at 933, *appeal dismissed*, No. 22-2544, 2022 WL 18863675 (7th Cir. Dec. 1, 2022).

But that conclusion is incorrect. The Guideline does include machineguns because it expressly reaches cases where the "offense involved a firearm described in 26 U.S.C. § 5845(a)," and that statute explicitly includes machineguns, including machinegun conversion devices. *See* 26 U.S.C. § 5845(a)(6) and (b). By starting with the premise that the Guideline excludes machineguns, however, the *Hixson* court never addressed the relevant Guideline language, let alone attempted to reconcile it with the commentary language on which the court relied. That Guideline language, as discussed above, reaches specific types of firearms, including – pertinent here – a "firearm described in 26 U.S.C. § 5845(a)."[2]

---

[2] The *Hixson* court also says that the Guideline has "three references to the statutory definition of a machinegun," 624 F. Supp. 3d at 936, but that is also incorrect. The Guideline refers to the statutory definition of <u>firearm</u> in 26 U.S.C. § 5845(a), not to the statutory definition of machinegun, which is in § 5845(b).

### B. *Dupree* Requires the Application of the Guidelines' Unambiguous Terms without Resorting to the Guideline Commentary.

Machinegun conversion devices should be counted as firearms for an additional reason. Section 2K2.1 itself unambiguously applies to "firearm[s] that [are] described in 26 U.S.C. § 5845(a)," and resorting to the commentary is therefore inappropriate under this Circuit's binding precedent. In *United States v. Dupree*, the *en banc* Eleventh Circuit held that the Sentencing Commission's commentary to a Guideline can only bind a district court if it interprets a "genuinely ambiguous" Guidelines provision. *Dupree*, 57 F.4th at 1274-75. The Guideline here is not ambiguous. Indeed, it directly states that it applies to firearms defined in 26 U.S.C. § 5845(a), which include the machinegun conversion devices at issue here. Under *Dupree*, then, resorting to the commentary is inappropriate in this case, as the commentary cannot overrule the Guideline's direct and explicit direction that this Court should consider machinegun conversion devices as firearms.

That is what the court concluded in *United States v. Ervin*, 3:21-cr-22-MMH-MCR (M.D. Fla. Sept. 6, 2023). In that case, the defendants were convicted of, among other things, transferring unregistered firearms – more specifically, machinegun conversion devices – in violation of 26 U.S.C. §§ 5861 and 5871. *See Ervin*, Doc. 324, 327 (judgments). Like the present case, for the purpose of counting the number of "firearms" in the case, the *Ervin* PSR did not include the machinegun conversion devices because the Guidelines commentary defined the term "firearm" under 18 U.S.C. § 921(a)(3), and not 26 U.S.C. § 5845(a). The United States

9

objected, and the court ruled in its favor. *Ervin* Doc. 329 at 23-37, 48-55 (Sent. Hr'g Tr.)

Specifically, the court held that under *Dupree*, it could not defer to the Guidelines commentary if the Guideline itself was not ambiguous. *Id.* at 48. And looking at "the text, the structure, the history, and the purpose of the regulation," the court concluded there was no "ambiguity in what a firearm is when . . . applying these guidelines." *Id.* at 49. Any "ambiguity comes not from the structure or the language of the guideline itself, but rather, from the limiting definition of 'firearm' in the commentary." *Id.* at 50.

The court recognized that the Guidelines themselves called for a calculation under section 2K2.1 (the principal firearm section) because the defendants in that case had been convicted of distributing firearms, that is, unregistered machinegun conversion devices, in violation of 26 U.S.C. §§ 5861. *See id.* at 50. The court also observed that a machinegun conversion device was "a firearm for the offense of conviction, so it has to be a firearm, then, for the base offense level" calculation as well. *Id.* It followed that a machinegun conversion device would also be a "firearm" for the purpose of the specific offense characteristics because it "simply doesn't make sense" for the definition of "firearm" to change when pivoting from the base offense level to specific offense characteristics.

Moreover, the *Ervin* court noted that the literal application of the commentary could lead to an "anomalous result." *Id.* at 51. An individual who possesses "25 silencers is going to end up with . . . a significantly higher offense level than an

individual who possesses the same number of machine gun conversion devices or 250 machine gun conversion devices, because there would be no enhancement for the number of machine gun conversion devices." *Id.*

The *Ervin* court's reasoning is sound and should be applied in this case. The defendant's machinegun conversion devices are firearms under federal law and should be counted as firearms for Guidelines purposes. Accordingly, this Court should find that his offense involved "25-99" firearms and apply a 6-level enhancement under USSG § 2K2.1(b)(1)(C).

## II.   The Defendant Is a Firearms Trafficker, and as such, the Specific Offense Characteristic for Engaging in Firearms Trafficking Should Apply.

The undisputed facts show that the defendant illegally manufactured and sold numerous machineguns, silencers, and short-barreled rifles to two men who he believed were leaders of a biker gang. In short, he engaged in the trafficking of firearms. Therefore, a 4-level enhancement under USSG § 2K2.1(b)(5)[3] applies under the unambiguous term, "trafficking in firearms." *Cf. Dupree*, 57 F.4th at 1274-75.

---

[3] After the defendant was charged in this case, the firearms trafficking enhancement was amended in a variety of ways. *Compare* USSG § 2K2.1(b)(5) (eff. Nov. 1, 2021) *with* USSG § 2K2.1(b)(5) (eff. Nov. 1, 2023). Among other things, there is now an increased 5-level enhancement for certain trafficking conduct, rather than the former 4-level enhancement. "Pursuant to the *Ex Post Facto* Clause, if applying the Guidelines in effect at the time of sentencing would result in a harsher penalty, a defendant must be sentenced under the Guidelines in effect at the time when he committed the offense." *United States v. Kapordelis*, 569 F.3d 1291, 1314 (11th Cir. 2009). Under these circumstances, to avoid any *ex post facto* violations, the 2021 Sentencing Guidelines should apply in the defendant's case.

"Trafficking" is commonly defined as "the act of buying or selling usually illegal goods." *Trafficking Definition*, Merriam-Webster.com, https://www.merriam-webster.com/legal/trafficking (last visited November 30, 2023). That is what the defendant did – he sold illegal goods, specifically unregistered firearms and silencers. At the time of his arrest, the defendant was not employed, *see* PSR ¶¶ 72-83, but was deriving significant income from his illegal firearms sales, earning $14,800 from just two deals with the confidential informant (CI) and undercover agent (UC) who posed as gang members, *id.* ¶¶ 10, 13. After that second sale, the defendant stayed in contact his new customers, talking and texting with the UC, even sending him photos of more pistols, short-barreled rifles, and firearms silencers. *Id.* ¶ 15. When agents searched his home, they found additional merchandise (200 rounds of ammunition, a silencer, rifle, pistol, and 12 machinegun conversion devices), as well as the equipment and supplies to manufacture more illegal arms. *Id.* ¶ 16. These undisputed facts show that the defendant was engaged in firearms trafficking.

Nevertheless, if one ignores the common understanding of the term firearms "trafficking" and instead applies the definition in the Guidelines commentary, then the trafficking enhancement would still apply. According to the commentary, the enhancement applies if, among other things, the defendant:

(i) "transferred . . . two or more firearms to another individual" and

(ii) "knew or had reason to believe that such conduct would result in the . . . transfer . . . of a firearm to an individual . . . who intended to use or dispose of the firearm unlawfully."

USSG § 2K2.1 cmt. 13 (eff. Nov. 1, 2021). The court may consider all of the surrounding circumstances known to the defendant in determining whether the defendant was engaged in firearms trafficking. *United States v. Morrobel*, 754 F. App'x 867, 870 (11th Cir. 2018) (unpublished; citing *United States v. Asante*, 782 F.3d 639, 644 (11th Cir. 2015)); *United States v. James*, 752 F. App'x 805, 808-09 (11th Cir. 2018) (noting that the court considers "not what actually happened to the firearms, but instead to the circumstances known to the defendant" in determining whether the trafficking enhancement applies) (unpublished; citing *Asante*, 782 F.3d at 644)).

Here, the defendant clearly transferred two or more firearms, satisfying the first prong of the commentary's test. As for the second prong, the defendant had "reason to believe" that his transfer of the firearms to the CI and UC put them in the hands of individuals "who intended to use or dispose of the firearm unlawfully." .

First, the defendant had every reason to believe that the CI and UC intended to turn around and illegally distribute at least some of the unregistered machinegun, rifles, and silencers to others. The volume of sales over a short period of time told the defendant that. In less than three weeks, the "gang" leaders bought seven rifles, three pistols, and five silencers, and made plans to buy more from the defendant. PSR ¶¶ 10, 13-14. The defendant sold them too many guns for two men to possess themselves. The defendant had reason to believe that the CI and UC would share this cache of illegal firearms with other gang members or sell them. Crucially, each rifle was an illegal machinegun, unlawfully short-barreled, or both. None of these rifles were registered in the National Firearms Registration and Transfer Record. *Id.*

13

¶¶ 10, 13. Nor were the silencers. All were therefore illegal for the "gang" members to possess, or transfer to each other or third parties. 26 U.S.C. §§ 5861(d)-(e) and 5871.

     Second, in addition to having reason to believe the UC and CI would illegally transfer the guns, the defendant had reason to believe that they intended to use them to commit violent crimes. The defendant was not selling hunting rifles. These were short-barreled machineguns equipped with silencers, after all. And the defendant believed that he sold them to a biker gang. When ordering the guns, the gang's "sergeant-at-arms" (the UC) emphasized that he wanted the firearms to be short, fully automatic, and equipped with silencers to keep them quiet. PSR ¶ 11. In response, the defendant did not ask why the UC would need quiet, easy to conceal, fully automatic weapons. He did not respond by asking whether the UC was a felon. He did not respond by asking why the UC was buying guns from him and not a federally licensed gun shop. Instead, the defendant responded with options for how to make the machineguns even quieter. *Id.*

     After the first deal, the defendant told the CI that he had armor-piercing ammunition. PSR ¶ 12. He obviously thought that the gang had an interest in the ability to shoot to penetrate someone wearing body armor. He also told the CI that the firearms that he was manufacturing were like the ones that U.S. Navy SEALs carry in battle. *Id.* The defendant knew, and more importantly wanted his customers to know, that he was selling weapons designed for war, not target practice.

During the two deals, no paperwork changed hands. In all, the CI and UC paid him $14,800 – in cash. *Id.* ¶¶ 10, 13. The defendant would have known that silencers and machineguns built by an unlicensed manufacturer like him and sold for cash, without paperwork, would be untraceable – perfect for gang warfare.

Based on these facts, under the applicable preponderance of the evidence standard, *see Askew*, 193 F.3d at 1183, the United States has established that (i) the defendant transferred more than two or more firearms, and (ii) he had reason to believe that his sale of firearms resulted in their transfer to individuals "who intended to use or dispose of the firearm unlawfully." – either by the gang illegally transferring them or by committing violent felonies. USSG § 2K2.1 cmt. 13 (eff. Nov. 1, 2021); *see Morrobel*, 754 F. App'x at 870 (finding no clear error where district court applied trafficking enhancement based upon evidence that defendant "sold several firearms with silencers or large capacity magazines, one of which was stolen and one of which had a defaced serial number," and engaged in multiple transactions with the same buyer, and therefore had reason to believe that the purchaser intended to use the firearms for criminal purposes).

The 4-level enhancement under § 2K2.1(b)(5) therefore would necessarily apply under either the pre- or post-*Dupree* interpretation of the term "trafficking."

15

### III. The Defendant (i) Transferred Firearms with Reason to Believe that They Would Be Used or Possessed in Connection with Another Felony Offense, and (ii) Possessed Firearms in Connection with Another Felony Offense.

The defendant transferred firearms to individuals who he had reason to believe would illegally transfer them or use them to commit violent felonies. He also possessed firearms in connection with his methamphetamine habit, which necessarily involved felony possession of a controlled substance. For both of these reasons, a 4-level enhancement should apply under USSG § 2K2.1(b)(6)(B).

Under that provision, an offense level enhancement applies if the defendant either (i) "transferred any firearms . . . with . . . reason to believe that it would be used or possessed in connection with another felony offense" or (ii) "possessed any firearm . . . in connection with another felony offense." USSG § 2K2.1(b)(6)(B). A firearm is used or possessed "in connection with" another felony offense if the court finds that "the firearm . . . facilitated, or had the *potential of facilitating*, another felony offense." *United States v. Bishop*, 940 F.3d 1242, 1250 (11th Cir. 2019) (emphasis added; citing USSG § 2K2.1, cmt. 14(A)). Notwithstanding the apparent overlap between this enhancement and firearms trafficking enhancement, both can apply where, as here, their respective elements are satisfied. USSG § 2K2.1 cmt. 13(D).

As established in detail above (in the discussion of the firearm trafficking enhancement, *see supra* at 12-15), the defendant illegally transferred deadly weapons with reason to believe that the CI and UC would use them to commit new crimes. Again, the defendant was aware of facts and circumstances suggesting that "gang" members would either illegally sell or transfer the unregistered, fully automatic

16

machineguns and silencers (a felony offense under 26 U.S.C. §§ 5861(e) and 5871) or use them to commit violent crimes (such as armed robbery, aggravated assault, or murder – all of which are felony offenses, *see* Fla. Stat. 812.13(2)(a), 784.021(1)(a), 782.04(1)(a)). In short, the defendant "transferred . . . firearms . . . with . . . reason to believe that [they] would be used or possessed in connection with another felony offense," and accordingly, a 4-level enhancement applies  USSG § 2K2.1(b)(6)(B).

This same enhancement applies for the independent reason that the defendant's possession of firearms had the potential to facilitate his criminal possession and use of methamphetamine. Possession of methamphetamine is a felony offense. Fla. Stat. 893.13(6)(a). While the defendant was illegally manufacturing, possessing and selling firearms, he also was a habitual methamphetamine user. It is undisputed that from April 2022 until his arrest in February 2023, he used meth *every* day. PSR ¶¶ 61, 16. Consistent with his daily use, agents found a bag of methamphetamine and a meth pipe in his home on the day of his arrest. *Id.* ¶ 16. Later that day, the defendant provided a urine sample, which was tested and yielded a positive result for amphetamine. *Id.* ¶ 17.

Based on these facts, the Court should find that the defendant's possession of firearms had the potential to facilitate his daily methamphetamine habit. Buying, selling, and using methamphetamine are dangerous activities. A daily meth user – like the defendant –must meet regularly with people who distribute meth, that is, drug dealers. A daily meth user must frequent places where methamphetamine is sold. Those locations are also frequented by other meth addicts. Experience tells

us that drug dealers are often armed and dangerous. Their customers lie, cheat, steal to get drugs or money from dealers and other addicts (like the defendant).

Guns are a tool of the drug trade. The defendant's possession of firearms had the potential to facilitate his felony possession of methamphetamine because his firearms could protect him during drug deals from both dealers and other addicts who might seek to cheat or rob him. His daily desperation to buy and use methamphetamine supports a finding that his firearm possession had potential to facilitate his serial drug crimes. *See Bishop*, 940 F.3d at 1253 (recognizing that under "some circumstances a small quantity of drugs may be more valuable to an addict whose actions are motivated by desperation than a larger quantity may be to someone who is in the business of trafficking drugs"); *see also United States v. Garcia*, 272 F. App'x 857, 859 (11th Cir. 2008) (unpublished; affirming application of enhancement where firearm possession had the potential of preventing theft and thus could facilitate felony possession of drugs for personal use); *United States v. Wooten*, 253 F. App'x 854, 858 (11th Cir. 2007) (unpublished; affirming application of enhancement where shotgun in the truck of a car had the potential of facilitating felony possession of marijuana, packaged for personal use, in the passenger compartment).

In summary, it is more likely than not that the defendant's possession of firearms had the potential of making it easier to buy and possess methamphetamine. And it is more likely than not that the defendant transferred firearms to the CI and UC with reason to believe that they had the potential to facilitate the commission of

18

other felony offenses.   For both of these reasons, a 4-level enhancement applies under USSG § 2K2.1(b)(6)(B).

## CONCLUSION

This case involves exceptionally dangerous conduct.   The defendant illegally manufactured and sold numerous unregistered silencers, short-barreled rifles, and machineguns to men who he had reason to believe were criminals.   Once properly calculated, the Guidelines range will be high and rightly so.   Given the defendant's conduct, a substantial sentence is necessary to further the statutory purposes of sentencing.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

*/s/ Michael J. Coolican*
MICHAEL J. COOLICAN
Assistant United States Attorney
USAO No. 156
300 North Hogan Street, Suite 700
Jacksonville, Florida   32202-4270
Telephone:   (904) 301-6300
Facsimile:   (904) 301-6310
E-mail:   michael.coolican@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Scott Schmidt, Esq.

*/s/ Michael J. Coolican*
MICHAEL J. COOLICAN
Assistant United States Attorney
